RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0112p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

CHOICE L. CAUSEY; HENRETTA DENISE BRADLEY,
    *Plaintiffs-Appellees,*

  *v.*

CITY OF BAY CITY; JOHN MAY; THOMAS PLETZKE,
        *Defendants,*

JOSEPH E. DOYLE; ERIC SPORMAN; KEN SOUSER,
      *Defendants-Appellants.*

No. 05-1142

>

―――――――――――――

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 02-10318—David M. Lawson, District Judge.

Argued: December 8, 2005

Decided and Filed: March 29, 2006

Before: MOORE, ROGERS, and MCKEAGUE, Circuit Judges.

―――――――――――――

## COUNSEL

―――――――――――――

**ARGUED:** Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellants. Russell C. Babcock, MASTROMARCO & JAHN, Saginaw, Michigan, for Appellees. **ON BRIEF:** Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellants. Victor J. Mastromarco, Jr., MASTROMARCO & JAHN, Saginaw, Michigan, for Appellees.

ROGERS, J., delivered the opinion of the court, in which MCKEAGUE, J., joined. MOORE, J. (pp. 7-8), delivered a separate dissenting opinion.

―――――――――――――

## OPINION

―――――――――――――

ROGERS, Circuit Judge. Defendants Joseph E. Doyle, Eric Sporman, and Ken Souser, all of whom are police officers, appeal the district court's denial of their motion for summary judgment in this § 1983 action brought by plaintiffs Choice L. Causey and Henretta Denise Bradley. The plaintiffs allege that the officers violated their Fourth Amendment rights when the officers, without a warrant, entered and searched the plaintiffs' backyard and residence. The officers were responding

1

to a confirmed 911 call that gunshots had been fired from the plaintiffs' residence.  The officers argue that exigent circumstances justified the warrantless entries and searches and that the district court therefore erred by denying their claim of qualified immunity.  Because exigent circumstances justified the entries, we reverse the order of the district court denying the officers qualified immunity.

**I.**

Except where noted, the following facts are undisputed.  At approximately 7:30 p.m. on December 31, 2000, Officers Doyle and Sporman were dispatched to 417 South Sheridan Street, the plaintiffs' residence, to investigate a call reporting several gunshots fired from the backyard of that address.  J.A. at 145-46.  Officer Doyle knocked on the front door but received no response.  J.A. at 147.  Causey testified in his deposition that he and Bradley heard the knock but did not answer because they were in bed.  J.A. at 269.

The officers then learned from the dispatcher that the call came from 415 South Sheridan Street.  J.A. at 148.  Officer Sporman went to that address to question the caller, Lisa Stevens.  J.A. at 156.  Stevens told Sporman that she had heard a single gunshot followed a few minutes later by five more gunshots, all of which came from the back area of 417 South Sheridan Street.  J.A. at 159.  Stevens also told the officers that shots had been fired from that residence on July 4th and the previous New Year's Eve.  J.A. at 149.  Finally, Stevens told the officers that she had not seen anyone enter or leave 417 South Sheridan Street after having called the police.  J.A. at 149.

The officers then entered the plaintiffs' fenced backyard.  J.A. at 156.  Noticing a small indentation in the snow on the back patio deck, Officer Sporman "reached down into the snow and scooped up" a bullet casing.  J.A. at 156.  Officer Doyle saw other indentations and "scooped up three more . . . casing[s] out of the snow."  J.A. at 156.  Before or after this discovery, one of the officers knocked on the back door of the house and received no answer.  *Compare* J.A. at 156 (Officer Doyle knocked after), *with* J.A. at 497 (Officer Sporman knocked before).

Either a dispatcher or Sergeant Nancy Feinauer telephoned the residence to contact its occupants, but no one answered.  *Compare* J.A. at 160 (Sgt. Feinauer called), *with* J.A. at 498 (a dispatcher called).  Officers Doyle and Sporman learned that earlier in the evening, the dispatcher had received from 417 South Sheridan Street both a hangup call and a return call explaining that the earlier call had been made by a child playing with the telephone.  J.A. at 159.  The officers spoke again with Stevens, who once more stated that she heard one gunshot that was followed a couple of minutes later by four or five more gunshots.  J.A. at 160.  Stevens also told the police that she did not think that any children were at the plaintiffs' residence.  J.A. at 160.

Based on the foregoing information, Sergeant Feinauer authorized a warrantless, forcible entry of the plaintiffs' residence to check for any injured persons inside.  J.A. at 160.  Sergeant Feinauer told the officers that she was sending backup.  J.A. at 336-37.  Officers Doyle and Sporman waited an estimated "15 to 30" minutes for their colleagues to arrive.  J.A. at 337.

After the arrival of backup, Officer Doyle knocked once again on the plaintiffs' front door.  Officer Doyle knocked loudly on the front door six times and yelled that the police would enter the house.  J.A. at 166.  Officer Souser, who had arrived to provide backup, forced the plaintiffs' front door open with a battering ram.  J.A. at 171.

The parties disagree as to some events surrounding the events immediately preceding the officers' forced entry.  The plaintiffs allege that they responded to this, the second, knock at the front door.  Causey testified that, at some point, he and Bradley spoke to the officers through a window.  J.A. at 270.  The officers told them that "they were there to check the well-being of the occupants."  J.A. at 270.  According to Causey, Causey and Bradley "explained to them [that they] were fine."

J.A. at 270.  Causey and Bradley also showed the officers that there were "no black eyes, no signs of fighting, none of that physical—none of that."  J.A. at 270.  Officer Doyle, however, testified in his deposition that no one within the house responded to the officers' knocks and commands.  J.A. 338.  For purposes of this appeal, we assume the plaintiffs' version.

The parties also dispute the nature of the officers' conduct once they entered the plaintiffs' residence.  The district court addressed only the constitutionality of the officers' entry, so the post-entry facts are not relevant to the issues presented in this appeal.

The plaintiffs brought suit under 42 U.S.C. § 1983, asserting that the officers violated their Fourth Amendment rights.  The officers moved for summary judgment on the basis of qualified immunity, arguing that exigent circumstances justified their conduct.  The district court denied the officers qualified immunity, holding that no exigency existed.  *Causey v. City of Bay City*, 353 F. Supp. 2d 864, 880-83 (E.D. Mich. 2005).  The officers now appeal.  We reverse the district court's order denying qualified immunity with respect to the officers' actions up to and including the entry.[1]

## II.

"Because review of a denial of qualified immunity is an issue of law, our review is *de novo*." *E.g.*, *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005).  "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether an officer is entitled to qualified immunity, we employ a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."[2]  *Id.*  (internal citation omitted).

---

[1] On remand, the district court may determine whether the officers are entitled to qualified immunity for their post-entry conduct.

[2] As we recently explained in *Estate of Carter*,

> Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here.  As two recent opinions indicate, both the two-step approach and the three-step approach can be said to capture the holding of *Saucier v. Katz*, 533 U.S. 194 (2001). *Compare Dunigan v. Noble*, 390 F.3d 486, 491 n.6 (6th Cir. 2004) (two-step approach), *with Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005) (three-step approach).  The third step is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (internal quotation omitted).  In cases subsequent to *Saucier* the Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps, *see, e.g.*, *Brosseau v. Haugen*, __ U.S. __, 125 S. Ct. 596, 596 (2004); *Groh v. Ramirez*, 540 U.S. 551, 563 (2004), but the three-step approach may in some cases increase the clarity of the proper analysis.  In many factual contexts, however, including this one, the fact that a right is "clearly established" sufficiently implies that its violation is objectively unreasonable. *Cf. Champion*, 380 F.3d at 905.

408 F.3d at 311 n.2.  Because, in this case, we hold that the officers did not violate the Constitution, it is unnecessary to address the "clearly established" prong.

### III.

The officers did not violate the plaintiffs' Fourth Amendment right to be free from unreasonable searches by entering either the backyard or the residence. "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Payton v. New York*, 445 U.S. 573 (1980), and *Johnson v. United States*, 333 U.S. 10 (1948)). A fenced backyard such as the plaintiffs' is within the curtilage of the residence and therefore receives Fourth Amendment protection. *United States v. Jenkins*, 124 F.3d 768, 772-73 (6th Cir. 1997). "Warrantless entries [into the residence and curtilage] are permitted, however, where 'exigent circumstances' exist." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). We have traditionally found the existence of exigent circumstances "(1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). The safety exigency permits officers to make a warrantless entry into a residence "when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). The officers in this case reasonably suspected that immediate police action was necessary to ascertain whether someone inside the house was in peril, and therefore the officers are entitled to qualified immunity.

### 1.     The Plaintiffs' Backyard

The officers' warrantless entry into the plaintiffs' fenced backyard was a reasonable search because the officers had a reasonable fear that someone in the house needed their immediate aid. Our opinion in *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), in which we reversed the district court's denial of qualified immunity, is instructive. In that case, officers at the scene confirmed a neighbor's report that nine shots had been fired inside a particular residence, but they did not know whether anyone was in the house. The officers in that case heard a loud, male voice from the porch of the residence and saw a telephone cord stretched towards the back of the house from where the voice was coming. *Id.* at 1159. We held first that an exigent circumstance, due to safety concerns, existed when the officers had a reasonable belief that a suspect was likely to use a weapon and second that the officers in that case were reasonable "to conclude that the firing of nine gunshots suggests a willingness to use a weapon." *Id.* at 1160. At the time that the officers in this case entered the plaintiffs' backyard, they had received a report of the shots-fired call, confirmed with the neighbor who called that six shots had been fired from the "back area" of the plaintiffs' residence, and learned from the neighbor that she had not seen anyone enter or leave the plaintiffs' property after she called the police. The officers' confirmed information — that someone at the plaintiffs' residence had fired a gun six times, that no one had entered or left the residence since the shots were fired, and that no one had answered the first knock at the door — made it reasonable for them to believe that someone inside the house was willing to use a weapon and thus that an exigent circumstance existed.

There is no substantial basis to distinguish *Dickerson* from this case. Although the police in *Dickerson* heard a loud voice and saw a telephone cord extending to the area of the house from which the voice was coming, we did not rely on these facts in reaching our decision. Referring to *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996), we held first that an exigency exists when officers can demonstrate that a suspect has a willingness to use a weapon, and second that the firing of nine shots demonstrates such a willingness. Any evidence of the telephone cord and the loud voice was unnecessary to establish an exigency. It is also true that there were nine shots fired in that case and only six shots fired in this case. Yet, nowhere in the opinion do we intimate that fewer than nine shots would not be sufficient, and there is no apparent basis for concluding that firing nine shots suggests a willingness to use a weapon but firing six shots does not. Finally, although Stevens told

the officers in this case that she had also heard shots from the plaintiffs' residence on the previous Fourth of July and New Year's Eve, it was not unreasonable for the officers to discount this fact. The shots of December 31, 2000, were fired not at midnight but rather at 7:30 in the evening, and one shot was isolated from the other shots by a couple of minutes. Even if the officers' beliefs "[are] close question[s], the officers are entitled to the benefit of the doubt under the qualified immunity standard." *Dickerson*, 101 F.3d at 1160.[3] The officers' entry into the plaintiffs' backyard therefore did not violate the Fourth Amendment.

### 2.          The Plaintiffs' Residence

Because the officers continued to have a reasonable fear that someone in the house needed their immediate aid, the officers' warrantless entry into the plaintiffs' residence was a reasonable search. Plaintiffs attempt, but are unable, to demonstrate that the officers no longer reasonably believed that an exigency existed at the time that the officers entered the residence. Plaintiffs first point to the fact (which we accept for the purpose of this interlocutory appeal) that, from a window, they told the officers that there was no emergency and they showed the officers that there were no signs of violence. But by the time the officers received the plaintiffs' assurances, they had a report that shots had been fired from the residence, that a 911 call had been made from the residence, that someone in the residence claimed that a child had made the call, and that no children were thought to be in the residence. Although the officers might have inferred that an exigency did not exist from the plaintiffs' assurances that no one was injured, it was nevertheless "equally plausible and not unreasonable," *Dickerson*, 101 F.3d at 1160, for the officers to infer that either (1) the plaintiffs were concealing another person (perhaps incapacitated by the gunshots) inside the house or (2) the plaintiffs were being intimidated to give assurances by an unseen attacker in the residence. *See Commonwealth v. Morrison*, 710 N.E.2d 584, 587 (Mass. 1999) ("[The officers] might rightly be concerned that the assurances [that the woman] gave them at the door were the result of intimidation by the defendant whom they had reason to believe was lurking within."). The plaintiffs' assurances, therefore, did not render it unreasonable for the officers to continue believing that someone inside needed their aid.

The fact that the officers briefly investigated the situation and waited for backup does not preclude an exigency. Because we held that there was an exigent circumstance in *Dickerson* even though the officers in that case confirmed a shots-fired call with a neighbor before entering the residence, *see Dickerson*, 101 F.3d at 1154, the mere fact that the officers sought to confirm that shots were fired does not demonstrate by itself that no exigency existed. Moreover, waiting a half hour or less for backup also does not mean that there was no exigency. The officer who arrived on the scene in *Dickerson* waited for backup, but this court held that an exigency existed. As *Dickerson* demonstrates and the Seventh Circuit has held, officers may take "reasonable precautions to reduce the risk of serious injury to themselves or others . . . ." *United States v. Salava*, 978 F.2d 320, 324 (7th Cir. 1992). The officers in this case acted reasonably in the face of a potentially emergency situation.

Although this court has held that the exigent safety exception did not apply when police delayed their entry for an extremely long period of time to investigate, the delay in this case was not prolonged. In *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997-98 (6th Cir. 1994), we held that the officers' delay of four-and-a-half hours, even after backup had arrived, to investigate and

---

[3]There is no reason to address the distinct constitutional issue of whether the officers exceeded the scope of their search in the backyard by picking up casings in the snow. "This court will not decide issues or claims not litigated before the district court." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990). Nowhere in the plaintiffs' brief in opposition to the officers' motion for summary judgment, *see* J.A. 220-23, or in the plaintiffs' brief to this court, *see* Appellees' Br. at 19-21, do the plaintiffs challenge the scope of the search. The plaintiffs have challenged only the officers' entry into the backyard, which did not violate the Fourth Amendment.

monitor a situation involving a mentally unstable, armed man belied the officers' claim of exigent circumstances. We also held that the officers' claim that there were exigent circumstances was undermined by the fact that the man in that case had done nothing threatening for over four hours. This case, in comparison, presents a delay of, at most, a half hour while the officers awaited backup. Moreover, the officers in this case had a confirmed report of several shots fired. Therefore, although a very long delay can demonstrate that no exigent circumstances existed, the delay in this case was reasonable to protect the safety of the officers and others.

The officers' warrantless entry into the plaintiffs' residence was justified by exigent circumstances. Because the plaintiffs' Fourth Amendment rights were not violated by the entries into the plaintiffs' backyard and residence, "there is no necessity for further inquiries concerning qualified immunity" as to the entries. *Saucier*, 533 U.S. at 201.

## VI.

For the reasons set forth above, we **REVERSE** the order of the district court denying the officers qualified immunity regarding their entries into the plaintiffs' residence and backyard.

---

### DISSENT

---

KAREN NELSON MOORE, Circuit Judge, dissenting. When Officers Joseph E. Doyle, Eric Sporman, and Ken Souser ("officers") entered both the backyard and home of Choice L. Causey and Henretta Bradley ("plaintiffs") without a warrant, it was clearly established that there were no exigent circumstances to justify the warrantless entry.[1] Because I would thus affirm the district court's order denying qualified immunity, I respectfully dissent.

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972). Accordingly, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). When the government relies on exigent circumstances to justify a warrantless entry, it bears the burden of demonstrating that they existed. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

Relying principally on a report of the sound of gunshots coming from the plaintiffs' backyard, the officers invoke the category of exigent circumstances implicated when "a suspect represents an immediate threat to officers and the public." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 548 (6th Cir. 2003), *cert. denied*, 541 U.S. 1041 (2004). Our cases demonstrate that a shots-fired call must be accompanied by other evidence of the alleged shooter's dangerousness in order to constitute an immediate threat. In *Hancock v. Dodson*, 958 F.2d 1367 (6th Cir. 1992), exigent circumstances existed where, in addition to a shots-fired report, the police also knew that the suspect was "suicidal and possibly homicidal" (according to the suspect's psychologist) and had threatened to kill any responding officer. *Id.* at 1369, 1375. In *United States v. Bates*, 84 F.3d 790 (6th Cir. 1996), exigent circumstances were absent where, without more, the officers believed that suspects inside an apartment had a gun. *Id.* at 795. Explaining that "[t]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent," we cited several examples of evidence that would establish such a likelihood: "threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature." *Id.* Like the facts in *Hancock*, these examples evidence the suspected shooter's dangerousness and therefore go to the immediacy of the threat.

We applied *Bates* in *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), finding exigent circumstances where a neighbor called 911 to report nine gunshots coming from a house and confirmed the report in person to responding officers, the occupant of the house was drunk, and the officers heard the occupant "yelling in a threatening tone." *Id.* at 1154. The immediate threat was established not by the shots-fired report alone but by its combination with additional information that the alleged shooter was dangerous: he was drunk, and the police heard him shouting in a threatening manner. These circumstances are of a piece with the factors discussed in *Hancock* and *Bates*. Thus, in *Hancock* and *Dickerson* (and implicitly in *Bates*), we indicated that officers responding to a shots-fired report must have additional evidence of an immediate threat before entering a home without a warrant. In contrast, the officers here lacked any evidence of an immediate threat other than the shots-fired report itself.

---

[1] I agree that we need not address the issue of whether the officers' search (as opposed to entry) of the backyard violated the Fourth Amendment, because the plaintiffs have not properly raised it. Of course, the plaintiffs may request leave to amend their complaint under FED. R. CIV. P. 15(a).

Furthermore, even if a shots-fired report alone could establish exigent circumstances, the purported exigency would be extinguished by other circumstances showing that the gunshots did not represent an immediate threat. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997-98 (6th Cir. 1994). Here, the officers possessed precisely this kind of information. First, the plaintiffs answered the officers' knocks at the front door, explaining that they were fine and showing the officers that there were no signs of injury. Second, the plaintiffs' neighbor told the officers that she had heard gunshots coming from the plaintiffs' home on both the prior New Year's Eve and the Fourth of July, and she did not suggest that any harm had come from these prior incidents. This information showed that the gunshots heard by the neighbor did not present an immediate threat. Instead, the plaintiffs were simply celebrating another holiday in their idiosyncratic way. Of course, such conduct might well be illegal (and is probably a bad idea in any event), but that is beside the point. The Fourth Amendment prohibits entering a home without a warrant simply to investigate criminal acts that might have been committed inside, so the officers should have obtained a warrant if they wanted to arrest the plaintiffs for shooting a gun into the air.

The majority's reliance on *Commonwealth v. Morrison*, 710 N.E.2d 584 (Mass. 1999), to endorse the officers' dismissal of this evidence is unconvincing. It is true that the court concluded that the officers "might rightly be concerned that the assurances [a woman] gave them at the door were the result of intimidation by the defendant whom they had reason to believe was lurking within." *Id.* at 587. Yet there were specific reasons for the officers to doubt the sincerity of the woman's assurances: the officers knew that the defendant had been in the woman's apartment earlier that night, which made it more likely that he was there again; the officers knew that the woman had a "history of domestic problems" with the defendant (culminating in a protective order against him), which made it more likely that he was willing to intimidate the woman and had a reason to do so (i.e., to avoid being caught violating the protective order); and earlier that night, the woman had lied to the officers about the defendant's presence in her residence, which made it more likely that she was lying again. *Id.* at 585. Quite unlike *Morrison*, the officers here were aware of no facts to suggest that they should have disbelieved the plaintiffs' assurances or the neighbor's description of the plaintiffs' celebratory shooting habits.

As the cases discussed above demonstrate, it was clearly established that the circumstances known to the officers at the time they entered the plaintiffs' backyard and home were not exigent. Thus, the officers violated the plaintiffs' clearly established Fourth Amendment rights by proceeding without a warrant and are not entitled to qualified immunity. Accordingly, I respectfully dissent.